**VICTOR SHIPPING AND TRADING, LTD., Plaintiff,**

v.

**METAL TRANSPORT CORPORATION, Defendant.**

No. 82 Civ. 0849 (KTD).

United States District Court, S.D. New York.

March 8, 1984.

Donovan, Maloof, Walsh & Kennedy, New York City, for plaintiff; Richard E. Repetto, New York City, of counsel.

Burlingham, Underwood & Lord, New York City, for defendant; Michael Marks Cohen, Stephen P. Sheehan, New York City, of counsel.

OPINION

KEVIN THOMAS DUFFY, District Judge.

Plaintiff, Victor Shipping and Trading, Ltd. ("Victor Shipping"), time charter owner of the M.V. Gina Juliano, brought this admiralty action against Metal Transport Corporation ("MTC") for breach of contract. Plaintiff claims that in June, 1981 defendant chartered the M.V. Gina Juliano to carry a cargo of shredded steel scrap from the east coast of the United States to Turkey. Plaintiff alleges that defendant breached the charter agreement and seeks $299,367.90 in damages.

Defendant, on the other hand, asserts that the parties never entered into a binding charter of the M.V. Gina Juliano because the agreement was always "subject to confirming stem." MTC asserts that the supplier of the steel scrap, Portsmouth International Corporation ("Portsmouth"), did not "confirm stem" within the time period agreed upon by plaintiff and defendant, thereby excusing both parties from any of the agreed to performance. Alternatively, MTC asserts that if there was a binding charter of the M.V. Gina Juliano, then the parties should be directed to proceed with arbitration as provided by the charter. I find that plaintiff failed to prove that the parties entered into a binding charter, and, accordingly, dismiss plaintiff's complaint.

I held a one-day bench trial on this matter on January 12, 1984. Before the trial, the parties stipulated to the following undisputed facts as set forth in the Consent Pre-Trial Order at 2–10:

(A) At and during all times material hereto, Victor Shipping was and now is a corporation duly organized and existing under and by virtue of the laws of Bermuda with a principal office and place of business at Hamilton, Bermuda; and was and is engaged in the business of operating vessels pursuant to private contracts of carriage for hire on the high seas, and was the time-chartered owner of the M.V. Gina Juli-

ano, pursuant to a written time charter party dated May 8, 1981.

(B) At and during all times material hereto, Calumet Shipping International Limited ("Calumet") was and now is a corporation or other business entity duly organized and existing under and by virtue of the laws of a foreign sovereign with a principal office and place of business at 276 St. James Street, Montreal, Canada, and was at all relevant times and is at the present time the exclusive ship broker for Victor Shipping.

(C) At and during all times material hereto, MTC, the defendant herein, was and now is a corporation duly organized and existing under and by virtue of the laws of the State of New York, with its office and principal place of business at 1221 Avenue of the Americas, New York, New York.

(D) Defendant at all relevant times was a corporate affiliate of Phibro Export Sales Corporation ("PESC") which at all relevant times was a corporation duly organized and existing under the laws of the State of New York with its office and principal place of business at 1221 Avenue of the Americas, New York, New York.

(E) At all relevant times defendant was engaged in the business of, among other things, procuring ocean going cargo vessels for the purpose of transporting the cargoes of PESC.

(F) At and during all relevant times material hereto, David Schalit was employed by MTC in their chartering department and was charged with the duty of procuring ocean going cargo vessels to carry the various cargoes of PESC.

(G) On January 12, 1981 PESC entered into a contract ("January Contract") with the Portsmouth International Corporation of Portsmouth, New Hampshire, for the purchase of about thirteen thousand long tons of shredded steel scrap, ten percent more or less in PESC's option, for delivery F.O.B. vessel at Portsmouth, New Hampshire in February, 1981. Extensions of the delivery date were later agreed to and PESC did not actually take delivery under the January contract until June, 1981.

(H) Mr. Nathan G. Berney is PESC's Group Vice President in charge of steel scrap trading operations and at all relevant times was the primary employee of PESC in charge of and personally involved in negotiations with Portsmouth.

(I) During the week of June 15, 1981, Mr. Berney, or his assistant, Mr. Steven Mayer, contacted Portsmouth to discuss an additional purchase of approximately 10,-000 long tons of shredded steel scrap for shipment in late June of 1981, or early July of 1981, in combination with the shredded steel scrap purchased under the January contract. No contract terms were finally agreed upon but in anticipation of concluding this purchase Mr. Berney instructed Mr. Schalit to attempt to charter a vessel to carry a cargo of shredded steel scrap to Izmit Bay, Turkey, in late June/early July 1981.

(J) In June of 1981, MTC, through their chartering department, sought to charter a vessel to carry a cargo of shredded scrap steel to be loaded on the East Coast of the United States and to be carried to and discharged at a port in Turkey.

(K) David Schalit was employed by MTC and negotiated for the charter of a vessel to carry the subject cargo of shredded scrap steel. He circulated an inquiry in the charter market by telephone in his efforts to search for an appropriate vessel.

(L) Pursuant to the aforementioned inquiries, MTC was contacted by Calumet on or about June 17, 1981, and was advised by Calumet of the availability of the vessel M.V. Gina Juliano for the carriage of the cargo.

(M) At and during all times material hereto, George Buzea was a 50 percent shareholder in Victor Shipping and the President of Calumet. His duties included acting as chartering broker on behalf of Victor Shipping.

(N) On June 19, 1981, David Schalit and George Buzea agreed upon the main terms of a charter for the M.V. Gina Juliano,

subject to agreement upon charter party details and subject to stem by 10:00 a.m. on June 22, 1981.

(O) The fixture of the M.V. Gina Juliano was negotiated by MTC and Calumet on the basis of the Genjapscrap form of charter party, which provided for arbitration of disputes in New York.

(P) On or about Saturday, June 20, 1981, at 12:05 p.m. Calumet sent a telex to MTC confirming the agreement to the main terms of the fixture of the M.V. Gina Juliano, subject only to negotiating the details of the charter party based upon the Genjapscrap form and subject to stem on Monday morning, June 22, 1981, by 10:00 a.m.

(Q) The details of the fixture were discussed, negotiated and agreed upon between MTC and Calumet on Sunday, June 21, 1981, being subject only to stem the following Monday morning, June 22, 1981, by 10:00 a.m.

(R) On Monday, June 22, 1981, prior to 10:00 a.m., Calumet contacted MTC and was advised that the stem had not been confirmed. MTC requested an extension of time to confirm stem, which was granted to 12:00 noon June 22, 1981.

(S) Calumet again contacted MTC prior to 12:00 noon that same day, at which time MTC again advised that stem was not confirmed.

(T) All or part of the cargo of shredded steel scrap to be lifted on the subject voyage was to be stemmed from Portsmouth, New Hampshire, or Boston, or a combination of the two ports, although both the M.V. Gina Juliano fixture agreement and the M.V. Jay Laxmi charter party permitted MTC to load at one or two safe ports/berths on the East Coast of the United States located north of Cape Hatteras, North Carolina, at charterer's option.

(U) The intended carriage of shredded steel scrap from the East Coast of the United States to Turkey was a fairly standard carriage which MTC undertook on a regular basis during this time period.

It also is essentially uncontroverted that as of 12:00 noon, MTC had been contacted by the Heath-Rosenthal Chartering Company for the use of another vessel, the M.V. Jay Laxmi, to transport the steel scrap. *See* Defendant's Letter Dated January 30, 1984 at 2–3. Active negotiations began at least by 3:30 p.m. As of 5:45 p.m. of that same day, June 22, 1981, the fixture was concluded subject to the receiver's approval and defendant obtaining and confirming stem. Stem was confirmed as per the agreement by 11:00 a.m. June 23, 1981. The terms of the M.V. Jay Laxmi charter party, which was signed on June 23, 1981, and the fixture of the M.V. Gina Juliano were basically identical in terms, except that the layday cancellation period for the M.V. Gina Juliano also included the days of July 1st and 2nd, 1981, and, further, the freight rate for the M.V. Jay Laxmi was $1.40 less per ton than the freight rate agreed upon in the M.V. Gina Juliano fixture. *See* Plaintiff's Proposed Findings of Fact, ¶ 28; Defendant's Letter Dated January 30, 1984 at 3–4. Thus, the principle disputes stem from the failure of defendant to satisfy the condition precedent of confirming stem. *See* Consent Pre-Trial Order, Stipulated Fact (Q) at 8.

At trial, plaintiff, through Buzea's testimony, further asserted that prior to 12:00 noon it contacted MTC and agreed to extend defendant's time to confirm stem to 3:00 p.m. When defendant again stated that it could not confirm stem, plaintiff asserts that it granted a last extension to 5:00 p.m. At 5:00 p.m., according to plaintiff, defendant stated that there might be a problem with the stem. Allegedly, defendant requested and plaintiff agreed that Victor Shipping would leave the vessel unemployed until MTC had advised plaintiff that the stem had been confirmed. Plaintiff nevertheless began to look for an alternative charter party.

Defendant, on the other hand, claims that during the morning of June 22, 1981, Berney contacted Portsmouth to conclude the purchase of the additional 10,000 long tons of shredded steel scrap for delivery together with the January contract quantity commencing June 26, 1981 for loading

aboard the M.V. Gina Juliano. Mr. Edward Bowley, Sr., the President of the Portsmouth, was the person with whom Berney attempted to confirm stem. Mr. Bowley initially refused to enter into a contract requiring delivery commencing June 26, 1981. The loading facilities in Portsmouth, New Hampshire, apparently are a single berth which on June 22, 1981 according to defendant was occupied by M.V. Good Skipper loading a cargo of bulk sugar. Sugar can only be loaded during dry weather and Bowley advised Berney that poor weather could delay the completion of loading of the M.V. Good Skipper preventing the loading of scrap on another ship. Under these circumstances Bowley allegedly stated that he would not agree to sell the additional 10,000 tons for delivery commencing June 26, 1981. Therefore, defendant claims that Schalit told Buzea shortly after 12:00 noon on June 22, 1981 that defendant could not confirm stem, and that the M.V. Gina Juliano was free to obtain alternative employment.

On the morning of June 23, 1981, according to defendant, Berney again contacted Bowley who checked on the progress of the sugar-loading of the M.V. Skipper. Apparently the loading was going well because a short time later, Bowley agreed to the sale within the requested delivery period. Accordingly, MTC was able to confirm stem, and on June 26, 1981 defendant began loading of the steel scrap on to the M.V. Jay Laxmi.

Thus, the crux of the parties' factual dispute in this case is the extent to which MTC actually could not confirm stem, and whether defendant was requesting extensions of time from plaintiff to confirm stem, while negotiating a more advantageous charter with Heath-Rosenthal. As I discuss below, only the first issue is crucial to resolution of the instant dispute.

Two preliminary legal issues must be addressed first. Plaintiff argues that the term "subject stem" means that "if stem is not granted as required, no other ship can be fixed by charterers before the one initially fixed 'SUBJECT STEM' has received the first refusal to accept the amended dates or quantities." Consent Pretrial Order, Plaintiff's Contentions, ¶ 3 at 11–12. The only legal authority for this proposition that is cited by plaintiff is the Baltic and International Maritime Conference ("BIMCO") Recommended Principles enunciated in May 1969. These so-called "principles," however, were essentially promulgated by self-interested vessel owners and they were not sufficiently demonstrated by plaintiff to be the present usage or custom of the trade. Plaintiff has cited no other legal authority to support its position. Therefore, I do not find that plaintiff was entitled to a right of first refusal when the condition precedent of stem confirmation could not be met as agreed upon by the parties. Second, as defendant apparently agrees, I note that MTC had an implied duty to attempt in good faith to confirm stem. *See, e.g., Concrete Specialties v. H.C. Smith Construction Co.,* 423 F.2d 670, 672 (10th Cir.1970).

With these two principles in mind, I find that Victor Shipping has failed to sustain its burden of proof. Even if I were to resolve the second factual issue in plaintiff's favor—i.e., that plaintiff did extend the time period in which defendant could confirm stem to 5:00 p.m.—I cannot find that defendant acted in bad faith in failing to confirm stem and in chartering the M.V. Jay Laxmi. Plaintiff argues that MTC intentionally failed to confirm, yet it submitted no evidence of such an intent or bad faith. Conspicuously absent from plaintiff's proof is any evidence that Portsmouth actually did or was prepared to confirm stem at 10:00 a.m., 12:00 noon or at any earlier point than the 11:00 a.m. on June 23, 1981 that it did.

In the event that the M.V. Gina Juliano would not be available when MTC finally confirmed stem, defendant was entitled to ensure that it had alternative shipping arrangements. Plaintiff does not assert that it did not have the right to abandon defendant and to fix an alternative charterer when the 5:00 p.m. period expired. Nor could defendant have been assured that

plaintiff would continue to extend it time to confirm after the 10:00 a.m. condition was first not met. Thus, defendant's attempt to provide for the contingency of its failure to confirm stem before plaintiff found alternative employ for the vessel does not establish an inference of bad faith on defendant's part.

Accordingly, because plaintiff did not prove that defendant in bad faith failed to fulfill the condition precedent of confirming stem, the parties never had a binding charter agreement. Plaintiff's complaint, therefore, is dismissed.